LOUIS CINQUE *vs.* EDWARD S. BOYD, SUPERINTENDENT.

Third Judicial District, New Haven, January Term, 1923.
WHEELER, C. J., BEACH, CURTIS, BURPEE and KEELER, JS.

From an early date the exercise of some sort of safeguards and some measure of fostering care for lunatics, paupers, defectives of many sorts, and neglected and uncared-for children, has been known to the common law and to legislation.

The Act concerning Juvenile Courts (Public Acts of 1921, Chap. 336) was intended to create a court to conduct, not a criminal prosecution, but a civil inquiry to determine whether, in a greater or less degree, some child should be taken under the direct care of the State to safeguard and foster its adolescent life, and hence the Act is not unconstitutional as denying to the child the constitutional guaranties to which a person accused of a crime is entitled.

Nor does the proceeding become a criminal prosecution even though

Cinque *v.* Boyd.

one of the facts, which by definition of the Act are evidence of delinquency giving such courts jurisdiction, is a violation of any law of the State or local ordinance—in this case a taking of a small sum of money from a man said to be under the influence of liquor,—since this proceeding is not a trial for an offense but an ascertainment of the statutory ground for action by the State.

The Act is not objectionable as making unreasonable discriminations between localities because Juvenile Courts are not established throughout the State, since there exists no constitutional requirement that courts of a given nature or jurisdiction shall be uniform throughout the State.

The provisions of the Act as to appeals from orders of Juvenile Courts are sufficiently definite to be enforced, at least as applied to the Court of Common Pleas of New Haven County—the court here involved—and call for a hearing on appeal which may be *de novo* if the circumstances so require.

Since neither the Act nor any applicable statute provides for detention of the child or for admitting it to bail during the pendency of the appeal, the provision of the Bill of Rights (Const., Art. I, § 10), that no person shall be detained except in cases clearly warranted by law, applies, and the child cannot be held pending the appeal.

Argued January 25th—decided June 1st, 1923.

HABEAS CORPUS to procure the release of one Michael Cinque, a minor, from the Connecticut School for Boys at Meriden, to which he had been committed by the Juvenile Court of the City of New Haven (*Caplan, J.*) as a delinquent child, pursuant to Chapter 336 of the Public Acts of 1921, brought to and reserved by the Court of Common Pleas in New Haven County, *Simpson, J.*, upon an agreed statement of facts, for the advice of this court upon the questions of law arising in the cause. *Judgment advised for the plaintiff.*

The facts agreed upon by the parties are as follows:—

1. Michael Cinque, a minor fourteen years old, was on October 22d, 1922, arrested by the New Haven police and charged by them with having aided and abetted another boy or [other] boys in taking from the person of a man said to be under the influence of liquor, a small sum of money, said to be about $2.50.

2. Thereafter and on October 23d, 1922, said

Michael Cinque was complained against [by petition] by Sheridan T. Whitaker, City Attorney for the City of New Haven, in a complaint [petition] which appears as a part of the answer in this action, being a part of the warrant [of commitment] upon which the defendant herein seeks to justify his detention of the said Michael Cinque, and being that portion of said warrant of commitment which is the petition preceding the order for a hearing thereon.

3. On October 24th, 1922, said Michael Cinque was brought before the Juvenile Court for the City of New Haven, being a court claimed to have been established under, by virtue of and pursuant to Chapter 336 of the Public Acts of 1921.

4. On said day a hearing was ordered by said Juvenile Court upon said petition, and hearing was had by said Juvenile Court, *Jacob Caplan, Judge,* presiding, wherein said Michael Cinque was upon said petition presented to said Juvenile Court as a delinquent.

5. The claimed delinquency upon the part of the said Michael Cinque consisted of his having participated, as claimed, in the offense described in paragraph 1 of this statement of facts, and of his having been upon one or more previous occasions charged with petty theft.

6. On said day and at the conclusion of said hearing the said Michael Cinque was by said Juvenile Court committed to the Connecticut School for Boys at Meriden, whereupon said Michael Cinque and the representatives of the father of said Michael Cinque gave notice to said Juvenile Court of appeal, and offered bail for the appearance of said Michael Cinque on appeal.

7. Thereafter and on October 25th, 1922, the said Michael Cinque appeared before the *Hon. Jacob Caplan,* sitting as the Juvenile Court for New Haven, by counsel, and the parent of said Michael Cinque appeared,

Cinque *v.* Boyd.

by counsel, and appealed from the said judgment of the said Juvenile Court, which said appeal was allowed; whereupon said parties by said counsel moved that bail for the appearance of said Michael Cinque before the appellate court be fixed, which motion said Juvenile Court denied.

8. Thereafter bail was duly offered to the clerk of said Juvenile Court and refused, upon the ground that there was no authority in said Juvenile Court to take bail on appeal from its orders and judgments.

9. Thereafter, notwithstanding the allowance of said appeal, the clerk of said Juvenile Court did not return to the appellate court any record of the proceedings of said Juvenile Court or of the taking and allowance of said appeal, upon the ground that said clerk of said Juvenile Court was without authority and without instructions in the premises.

10. Thereafter this *habeas corpus* action was brought, and it being then discovered that no appeal papers from the action of said Juvenile Court had been returned to the Court of Common Pleas for New Haven County, to which said appeal under the terms of the statute lay, counsel for said Michael Cinque and the parent of said Michael Cinque obtained the appeal papers, a copy of which is attached to the statement of facts, and filed the same with the clerk of the Court of Common Pleas, civil side, for New Haven County.

11. Said clerk of the Court of Common Pleas for New Haven County received said papers, but refused to formally enter them upon the docket without the payment of $5 entry fee.

12. Said Michael Cinque is now in the custody of the probation officer for the City of New Haven, having been placed in said custody by the Court of Common Pleas upon the return of this action of *habeas corpus* to said court.

It appears from the record attached to and made part of the statement of facts, that in the petition of the prosecuting officer it is represented that the condition of the minor, Michael Cinque, was such that it was "for the best interest of said child that an order be granted directing his commitment to the Connecticut School for Boys at Meriden." Upon this petition an order was made by the judge of the Juvenile Court directing service upon the minor personally, and also upon the persons alleged to be liable for his support. It was further ordered that a medical examiner of New Haven examine the child, and report at the hearing as to whether or not the latter was mentally defective; and it was further ordered that a probation officer of the city of New Haven fully investigate and report at the hearing as to the residence and estate of the child, and as to the names, residences and pecuniary responsibility of those legally liable for the support of the child. It appears from the judgment and order of commitment that these reports were made, and considered by the court at the hearing.

The questions reserved for the consideration of this court are as follows: "Whether or not Chapter 336 of the Public Acts of 1921, pursuant to which Michael Cinque was purported to have been committed and confined in the Connecticut School for Boys at Meriden, is constitutional and valid, with special reference to these particulars, to wit: (a) That it denies the right of bail. (b) That it does not permit the accused to be confronted by the witnesses against him. (c) That it denies the protection of the same rules of evidence that are followed in all other cases. (d) That it denies the right of a trial by jury. (e) That it provides for the detention of a person committed in a penal institution although there is no conviction against him for any crime. (f) That it discriminates unjustly and unrea-

sonably between localities in the same State, because juvenile courts are established in some jurisdictions and not in others. (g) That it states in too broad and inclusive and unreasonable manner the definition of the term 'delinquent.' (h) That it denies any appeal to a court where the constitutional right of trial by jury, confrontation of witnesses and other similar rights can be enjoyed. (i) That the statute above referred to is so vague, indefinite and incomplete as to permit no reasonable and just interpretation by the officers administering it, because there is no form of appeal stated, nor can the court know whether it is sitting for a trial *de novo* or to review the record for error, nor is there anything to confer any jurisdiction upon the civil side of the Court of Common Pleas to hear appealed juvenile cases, nothing to confer any power upon any proper officer or officers to represent the State in any such appeal, and because the court is not empowered to make any final disposition of an appealed juvenile case.

"And whether or not, pending the disposition of the said appeal, the said Michael Cinque can be held without bail. And whether or not the said writ of habeas corpus shall be maintained or dismissed."

*Philip Pond* and *Raymond E. Baldwin,* for the plaintiff.

*Edwin S. Pickett,* for the defendant.

KEELER, J. The contentions of the plaintiff in this case are concerned with the constitutionality, or the validity otherwise, of Chapter 336 of the Public Acts of 1921, which is entitled "AN ACT CONCERNING JUVENILE COURTS." The purpose of the Act is to provide for the proper care, custody, education and rearing of children under the age of sixteen, who are dependent, uncared-

for, neglected, defective or delinquent. Dependent children are defined in the Act as those having a suitable home, but who, because of the poverty of parents or other persons maintaining such home, are in need of care; uncared-for children are defined as those who are homeless, or whose home is unsuitable for other reasons than poverty, and who may not support themselves except in occupations which are illegal, or which would subject them to conditions prejudicial to their normal development, physically, mentally or morally; neglected children are defined as those who, unable lawfully to support themselves, have been abandoned, or are being denied proper physical, mental or moral care, or are being permitted to live under the evil associations of home or other prejudicial conditions; defective children are defined as those who by deficiency or defect of intelligence require, or will require, for their own protection or the protection of others, special care, supervision and control; delinquent children are defined as those who violate any law of the State or local ordinance, or who are habitually truant or incorrigible, or who knowingly or wilfully associate with vicious, criminal or immoral persons, or who use vile, indecent or profane language, or are guilty of immoral conduct, or are growing up in idleness, ignorance and vice, or who absent themselves from home without just cause or the consent of parents, or who wander about at night-time, or who knowingly and wilfully engage in any practice, employment or occupation prejudicial to their normal development, physically, mentally or morally.

The administration of the provisions of this Act is confided to a new system of juvenile courts, separate from all other courts. The officials of every city, police, borough or town court are to hold like official positions in the juvenile courts. Said courts are to exercise

jurisdiction in the same territory included in the several jurisdictions of the courts above named. Their sessions are to be held separate from all other court sessions, with separate records not open to public inspection except by order of the court, but at all times subject to the inspection of the child concerned and its parent or guardian.

With reference to children within the classes above enumerated who come within the jurisdiction of such courts, the latter, except in matters of guardianship, adoption and property rights within the jurisdiction of courts of probate, the court has authority to make orders directed to parents, guardians, custodians or other adult persons owing some duty to children within the purview of the Act, as it shall deem necessary for the welfare, care and support of children subject to its jurisdiction, and to enforce the same.

Cases are brought to the court by the verified petition of a parent, guardian, selectman or other public official charged by law with the care of the poor, any prosecuting or probation officer, or the Connecticut Humane Society, or the State Board of Charities.

After the filing of a petition, the judge is to issue summons to the child and the parents or other persons having charge of a child to appear in court, to show cause why a child should not be dealt with in accordance with the provisions of the Act. Provision is made for the custody of a child during the investigation, and the admission of the child to bail pending final disposition of the matter. No child shall be confined in a jail or lock-up, or any place where adults are or may be confined, nor shall any child be held in solitary confinement. While so confined any child is to be under the orders, direction and supervision of the court.

Whenever any child is brought before any of the courts above mentioned, other than the Juvenile Court, the case against said child is to be transferred to the Juvenile Court. Upon arrest of any child by any officer, the latter is to turn such child over to the probation officer or other officer of the Juvenile Court, whenever practicable.

Investigation of the facts in the case, prior to the hearing is provided for, consisting of an examination of the parentage and surroundings of the child, his age, habits and history, home conditions and the character of his parents or guardians. In case of alleged delinquency, the investigation is to be made by the probation officer. An examination is directed to be made by a competent and experienced medical examiner as to the child's mentality. Reports of these investigations are to be made to the judge prior to his disposition of the case.

Judges are to exclude from the room where the hearings are held any person whose presence, in the opinion of the judge, is not necessary, and no hearing is to be held in a room regularly used for the transaction of criminal business. The conversations of the judge with a child before the court are privileged. When the court shall find that the child needs the care, discipline or protection of the State, it may commit the child to any public or private agency permitted by law to care for children, or to the custody of any suitable person, or order the child to remain at home under the care of the probation officer, or may suspend or withhold judgment. A child mentally defective may be committed to an institution for mental defectives or defective delinquents, or placed on vocational probation if over fourteen years of age and it is established by satisfactory evidence that he may properly be employed for part or full time at some occupation, and

that such employment would be more advantageous to his welfare than commitment to an institution or continuance at school.

Appeals may be taken by any person aggrieved by any order of the Juvenile Court to the Court of Common Pleas, of any county having civil jurisdiction, the District Court of Waterbury having civil jurisdiction, or to the Superior Court having civil jurisdiction in counties where there are no Courts of Common Pleas, to the next return-day of said several courts. Orders of notice as the court may deem reasonable shall be made and served upon persons interested, and "upon the proper prosecuting officer of the court to which such appeal may have been taken, and upon the department of public welfare."

Provisions are also made that an officer serving commitment process shall not, when so engaged, wear a uniform or badge. It is also provided that commitments shall not be made for a determinate time, but that the case shall at all times be subject to further order of the court and may at any time be reopened or terminated upon the application of parents, or upon the initiative of the Juvenile Court. If the governing body of the institution to which the child has been committed shall be of opinion that the commitment should not be terminated, recourse may be had to the Superior Court or a judge thereof.

Section 18 of the Act provides that "no child shall be prosecuted for an offense before a juvenile court, nor shall the adjudication of such court that a child is delinquent be deemed a conviction of crime." Section 19 provides that "the disposition of any child under the provisions of this act, evidence given in such cases, except evidence of crime which, if committed by a person of sufficient age, would be punishable by imprisonment in the state prison, and all orders

therein, shall be inadmissible as evidence in any criminal proceedings against such child."

Further provisions of the Act with reference to various officers concerned in its administration, and as to certain costs and expenses, it is unnecessary to summarize, as not having bearing upon the questions submitted by the parties to this court, all of which are given background in the foregoing outline, necessarily somewhat extended.

The law is attacked in this case largely upon constitutional grounds, and in some other respects as being invalid by obscurity and insensiblity to an extent rendering its full enforcement impossible. The constitutional objections turn upon whether the Act is one for the punishment of crime, and therefore subject in its form and in the manner of its administration to the constitutional guarantees in various particulars contained in the Bill of Rights, or whether it is concerned with the care and protection which every State as *parens patriæ* in some measure affords to all inhabitants who from personal deficiencies or incapacities or conditions of life are in some degree abnormal, and hence in its scope, intent and method of administration is entirely of a civil nature.

The exercise of some sort of safeguards and some measure of fostering care for lunatics, paupers, defectives of many sorts, neglected and uncared-for children, is not unknown to the common law and to early legislation. From a very early date children in England have been wards of Chancery, where the Chancellor exercised the prerogative powers of the crown in caring for unfortunate minors. It is true that this jurisdiction was most frequently exercised with regard to property rights involved, but this fact did not limit the jurisdiction. Classic examples of the exercise of this power occur in the case, *Wellesley* v. *Duke*

*of Beaufort*, 2 Russell, 1, where Lord Eldon took away from Long Wellesley, nephew of the Duke of Wellington, the custody of his children on account of his profligate life, and in the case of *Shelley* v. *Westbrooke,* Jacob, 266, where the same Chancellor deprived the poet Shelley of the custody of his children because of his declared atheism. These incidents occurred a century ago, and from that time on the American States have been continually enlarging their protective and summary jurisdiction for the protection and care of individuals abnormal in person and unfortunate in environment. Especially has this been the case with regard to children so circumstanced. Long ago, children convicted of misdemeanors came to be confined in places of detention separate from those devoted to the imprisonment of adult criminals, where the discipline enforced and the object sought has been reformatory rather than punitive. The culmination of these efforts has been the establishment of juvenile courts in many States, all of a somewhat similar type, and with procedure adapted to secure like results.

The ends sought in the establishment of these courts are tersely described in a monograph prepared by Flexner and Oppenheimer for the Children's Bureau of the United States Department of Labor, and reprinted in 57 American Law Review, wherein, at p. 67, occurs the following characterization: " The basic conceptions which distinguish juvenile courts from other courts can be briefly summarized. Children are to be dealt with separately from adults. Their cases are to be heard at a different time and, preferably, in a different place; they are to be detained in separate buildings, and, if institutional guidance is necessary, they are to be committed to institutions for children. Through its probation officers the court can keep in constant touch with the children who have appeared

before it.  Taking children from their parents is, when
possible, to be avoided; on the other hand, parental
obligations are to be enforced.  The procedure of the
court must be as informal as possible.  Its purpose is
not to punish but to save.  It is to deal with children
not as criminals but as persons in whose guidance and
welfare the State is peculiarly interested.  Save in
the case of adults, its jurisdiction is equitable, not
criminal, in nature." To the above succinct summary,
it may be added that in most juvenile courts the hear-
ings are as private as practicable, their records not
open to public inspection, and the contents thereof
with slight exception not evidence in other proceed-
ings, and that testimony given at hearings is in like
manner privileged.

It is contended by the plaintiff that since the Act
contemplates in the determination of delinquency the
examination in some cases of conduct which by the
criminal law of the State is an offense, then by reason
of the omission therefrom of certain provisions pro-
tecting persons accused of crime the Act is uncon-
stitutional.  In other words, the claim is that unless
provision be made for the right of admittance to
bail, confrontation of witnesses, the application of the
rules of evidence obtaining in criminal trials, due
course of law, trial by jury either originally or on ap-
peals, and that persons committed under the Act shall
not be confined in penal institutions where not con-
victed of crime, the Act is invalid as contravening cer-
tain provisions contained in the Bill of Rights.  It is
also objected that discrimination is made between dif-
ferent localities in the State.  The validity of the Act
is further attacked as a matter of interpretation, since
it is alleged that the definition of delinquency is too
broad and inclusive and is also unreasonable; also that
the statute is so vague and indefinite as to afford no

guide to certain officials concerned with its administration, and so to be insensible and impossible of execution. The particulars in which the Act is claimed to be deficient in this respect are that no form of appeal is stated, that the appellate court is not advised whether the appeal is *de novo* or only to review the record and findings of the Juvenile Court, that no jurisdiction is conferred upon the civil Court of Common Pleas to hear appealed cases, that no provision is made for a representative of the State in any appeal hearing, and that no power is given to the appellate court to finally dispose of an appealed case.

Further, there is reserved for the consideration of the court the question whether Cinque can be held without bail pending appeal, and as a conclusion, whether the writ of *habeas corpus* should be sustained or dismissed.

It is not necessary to repeat the extended summary of the Act before made, or to refer specifically to any of its particular provisions, to demonstrate that the Act was intended to constitute a court which should conduct a civil inquiry, to determine whether, in a greater or less degree, some child should be taken under the direct care of the State and its officials, to safeguard and foster his or her adolescent life, and not to conduct a criminal prosecution, nor to attach to the enforcement of the provisions of the Act any sanction of a criminal nature. If such a design has not been accomplished by the Act, it is difficult to see how it could be done. Of course an Act does not become one solely of a civil nature simply because it is called so, but its true nature is to be determined by the scope and nature of the provisions. If such courts are not of a criminal nature, then they are not unconstitutional because of the nature of their procedure depriving persons brought before them of certain constitutional

guarantees in favor of persons accused of crime.   This principle has been recognized in many States where juvenile courts exist, and only in one (Texas) has such an Act been held entirely void, while in Missouri the invalidity of the Act was based upon the statute in relation to constitutional provisions regarding courts.

Acts in all cases embodying, with greater or less fulness, provisions similar, and in many cases identical, with the Connecticut statute, have been held constitutional in the following cases: *Mill* v. *Brown*, 31 Utah, 473, 88 Pac. 609; *In re Sharp*, 15 Idaho, 120, 96 Pac. 563; *Lindsay* v. *Lindsay*, 257 Ill. 328, 100 N. E. 892; *Ex parte Ah Peen*, 51 Cal. 280; *Pugh* v. *Bowden*, 54 Fla. 302, 45 So. 499; *Jarrard* v. *State*, 116 Ind. 98, 17 N. E. 912; *Marlowe* v. *Commonwealth*, 142 Ky. 106, 133 S. W. 1137; *State* v. *Ragan*, 125 La. 121, 51 So. 89; *Farnham* v. *Pierce*, 141 Mass. 203, 6 N. E. 830; *Roth* v. *House of Refuge*, 31 Md. 329; *House of Refuge* v. *Ryan*, 37 Ohio St. 197; *State* v. *Dunn*, 53 Ore. 304, 99 Pac. 278, 100 id. 258; *Commonwealth* v. *Fisher*, 213 Pa. St. 48, 62 Atl. 198; *Milwaukee Industrial School* v. *Supervisors of Milwaukee County*, 40 Wis. 328; *Ex parte King*, 141 Ark. 213, 217 S. W. 465; *Childress* v. *State*, 133 Tenn. 121, 179 S. W. 643; *State* v. *Burnett*, 179 N. Car. 735, 102 S. E. 711; *In re Ferrier*, 103 Ill. 367; *United States ex rel. Yonick* v. *Briggs*, 266 Fed. Rep. 434; *Ex parte Januszewski*, 196 Fed. Rep. 123.

In the cases cited above, claims identical with all of those of the present plaintiff were made with reference to Acts establishing similar courts, and the constitutionality of the various Acts upheld.   The fundamental principle of decision running through them all is that the inquiries conducted by juvenile courts are not criminal trials.

*Commonwealth* v. *Fisher, supra,* was a case arising

under the Juvenile Court Act of Pennsylvania, decided in 1905, at a time when there. was a considerable body of decisions derived from cases in other jurisdictions; the case was exhaustively treated, and the opinion has been extensively cited and quoted in the numerous subsequent cases through the country as an authoritative exposition of the constitutional position of courts of this nature. We quote a portion of the opinion (p. 52): "In pressing the objection that the appellant was not taken into custody by due process of law, the assumption, running through the entire argument of the appellant, is continued, that the proceedings of the Act of 1903 are of a criminal nature for the punishment of offenders for crimes committed, and that the appellant was so punished. But he was not, and he could not have been without due process of law, for the constitutional guaranty is that no one charged with a criminal offense shall be deprived of life, liberty or property without due process of law. To save a child from becoming a criminal, or from continuing in a career of crime, to end in maturer years in public punishment and disgrace, the legislature surely may provide for the salvation of such a child, if its parents or guardian be unable or unwilling to do so, by bringing it into one of the courts of the State without any process at all, for the purpose of subjecting it to the State's guardianship and protection. The natural parent needs no process to temporarily deprive his child of its liberty by confining it in his own home, to save it and to shield it from the consequences of persistence in a career of waywardness, nor is the State, when compelled, as *parens patriæ*, to take the place of the father for the same purpose, required to adopt any process as a means of placing its hands upon the child to lead it into one of its courts. When the child gets there and the court, with the

power to save it, determines on its salvation, and not its punishment, it is immaterial how it got there. The Act simply provides how children who ought to be saved may reach the court to be saved. If experience should show that there ought to be other ways for it to get there, the legislature can, and undoubtedly will, adopt them, and they will never be regarded as undue processes for depriving a child of its liberty or property as a penalty for crime committed.

" The last reason to be noticed why the Act should be declared unconstitutional is that it denies the appellant a trial by jury. Here again is the fallacy, that he was tried by the court for any offense. 'The right of trial by jury shall remain inviolate,' are the words of the bill of rights, and no Act of the legislature can deny this right to any citizen, young or old, minor or adult, if he is to be tried for a crime against the Commonwealth. But there was no trial for any crime here, and the Act is operative only when there is to be no trial. . . . The Act is not for the trial of a child charged with a crime, but is mercifully to save it from such an ordeal, with the prison or penitentiary in its wake, if the child's own good and the best interests of the State justify such salvation. Whether the child deserves to be saved by the State is no more a question for a jury than whether the father, if able to save it, ought to save it. If the latter ought to save, but is powerless to do so, the former, by the Act of 1903, undertakes the duty, and the legislature, in directing how that duty is to be performed in a proper case, denies the child no right of a trial by a jury, for the simple reason that, by the Act, it is not to be tried for anything. The court passes upon nothing but the propriety of an effort to save it; and if a worthy subject for an effort of salvation, that effort is made in the way directed by

the Act. The Act is but an exercise by the State of its supreme power over the welfare of its children, a power under which it can take a child from its father, and let it go where it will, without committing it to any guardianship or any institution, if the welfare of the child, taking its age into consideration, can be thus best promoted."

Applying the above well-considered observations to the instant case, it appears that one of the instances of the facts which, by the definition of our Act, are evidence of delinquency, is the violation of "any law of the State or local ordinance," and such a violation was the leading consideration by reason of which the boy was found delinquent and committed to the Connecticut School for Boys. He had taken a small sum of money from a man said to be under the influence of liquor. This the court considered under the Act, doubtless with other pertinent evidence, to constitute delinquency. But the boy was not found guilty of theft from the person or of petty larceny; facts which might have given ground for a prosecution for such offenses, in the inquiry had were received as evidence of delinquency, and this was the ground of his commitment. He was tried for no offense, he came under the operation of the law in order that he might not be tried for any offense. None of his constitutional rights were denied him, for he was never placed in a position which called for the application of constitutional guaranties.

The application of constitutional guaranties to commitments to the Connecticut School for Boys was before this court in the case of *Reynolds* v. *Howe*, 51 Conn. 472. In this case John Reynolds, a minor of the age of eleven years, was committed to the State Reform School at Meriden by a justice of the peace on complaint of a grandjuror. An appeal was

taken to the Superior Court, and erased from the docket for want of jurisdiction, and thereupon an application for a writ of *habeas corpus* was made by the father of the minor, denied by the court, and an appeal taken to this court. The original complaint was based upon Chapter 119 of the Public Acts of 1881, which, among other matters, provided that any boy under the age of sixteen "who is in danger of being brought up, or is brought up, to lead an idle or vicious life," might by a justice of the peace be committed to the State Reform School. Objection to the constitutionality of this Act was made by counsel in this court, upon very much the same grounds of attack as have been put forth in the instant case: that the right of appeal and, inferentially, to a jury trial, was not allowed; that the charge being preferred by a grandjuror, a criminal prosecuting officer, was a criminal prosecution; that no provision was made for a hearing (in the present case the claim is that no provision is made for a proper and legal hearing); that there was no adequate definition of the term "vicious."

This court held the statute constitutional. In the opinion of the court (PARK, C. J.) it is said: "It is manifest that this statute, so far as we have quoted it, creates no crime and does not treat the condition of the boy as anything for which he is in fault. It found its origin in the social necessity of saving boys from impending ruin and the community from the prevalence of crime. It is of the same nature with statutes which authorize the compulsory education of children, the binding of them out during minority, the appointment of overseers and conservators to take charge of the property of those who are incapable of managing their own affairs, the confinement of the insane, and the like. The welfare of society requires and justifies such enactments. To bring up a boy to

lead an idle life is, as a general rule, to educate him to a vicious life. . . . The proceeding under the statute, for committals by a justice of the peace to the State Reform School, is not a criminal one, since the matter presented by the complaint is not a criminal one; and clearly it is not a civil one. It therefore does not come within the statute allowing appeals, any more than would a proceeding for the restraint of the insane.

"But it is said that the complaint was made by a grandjuror, and in his official capacity, and that grandjurors have authority to act as such only in criminal cases; and it is claimed by the plaintiff that the proceeding, if not a criminal one, was void. But any person may bring the matter before the justice, and it matters not that he is a grandjuror and assumes to act as such. Indeed the justice could take up the matter himself without any formal complaint. The statute provides for no special formality. . . .

·"It is further claimed that the statute is unconstitutional in granting power to justices of the peace to commit a person to a place of confinement for such a cause, and upon an inadequate hearing and especially without a right of appeal. But as we have shown, the boy is not proceeded against as a criminal. Nor is confinement in the State Reform School a punishment, nor in any proper sense imprisonment."

This case was quite an early one in the numerous adjudications upon the constitutional validity of commitments to reformatory institutions, and has been frequently cited and quoted with approval in later cases in other jurisdictions.

In holding that the Act now before us for construction is not of a criminal nature, we dispose of all claims founded upon its want of conformity to the constitutional guaranties in that regard.

It is claimed that there is unjust and unreasonable distinction between localities, because juvenile courts are not established throughout the State. In this State there is no constitutional provision that courts of a given nature or jurisdiction shall be uniform throughout the State, although such a provision does exist in certain of the States. With us Courts of Common Pleas are established in some counties, and not in others, some towns have town courts, others not. It is entirely a matter of legislative cognizance.

Regarding the right of appeal, counsel contend that it is denied because the provisions relating to the appeal granted by the Act are so vague and uncertain as to be inoperative. It will be seen from the authority just cited that no right of appeal need be granted in cases of this character. The provisions regarding appeal in this Act are perhaps not as clearly drawn as might be desired, but they are by no means obscure or unreasonable as counsel assume. Because the omission to provide for the conditions existing in Hartford County, where there is no Criminal Court of Common Pleas, and no prosecuting officer connected therewith, may be serious as applicable to that county, it cannot go to the entire validity of the Act nor to its operation in New Haven, where the conditions contemplated in the statute exist. It is further urged by counsel that the civil Courts of Common Pleas have no jurisdiction except that expressly and in terms conferred upon them by statute, that is, that they are courts of limited jurisdiction. They are limited in respect to the pecuniary extent of their jurisdiction but within such limit they are courts of general jurisdiction proceeding according to the course of the common law, and competent to hear and determine any matter which by statute may be allotted to them, and when it is by statute provided that an appeal may

be taken to such courts, the right to hear and determine the appeal follows as a matter of course. But it is further contended that no procedure in the appeal is provided for in the statute. There is not, but such is the case on an appeal from inferior courts in criminal cases and in civil cases. When the case reaches the appellate court it is disposed of in accordance with the ordinary procedure in such cases provided, a trial *de novo* either with or without jury according to the legal rights of the parties in the given case.

In the original proceeding in the Juvenile Court it is provided that the judge shall not dispose of the case until the reports provided to be made in cases of delinquent children as to their home conditions, prior life and the character of parents or guardians, of their mentality, and from any school which they may have attended, shall have been completed and filed with the judge. With these reports before him the judge proceeds to hear testimony, presumably all legal testimony offered by any party in interest, and then disposes of the case. It would seem clear that the appellate court should dispose of the case in much the same way. The reports above mentioned would be before it, either as part of the record on appeal, or could be obtained and used evidentially, and upon these reports, supplemented by oral testimony, the court would determine the appeal. Whether such a hearing is to be called *de novo* or not is not of importance. If the case required a hearing *de novo* it certainly could and should be had. As above noted, the trial of ordinary criminal and civil appeals to Courts of Common Pleas are not conducted in accordance with specific statutory procedure, but are naturally and legally determined in that regard by the nature of the case. It certainly is not true that there is not sufficient inherent power in these courts, by reason of the juris-

diction conferred, to adapt their procedure to the exigencies of the case and the rights of parties brought before them, and we decline to believe, as suggested by counsel on both sides of this controversy, that the mental and professional equipment of the personnel of these courts is inadequate to the task.

The final question propounded for our advice is whether, pending the appeal, the boy can be held without bail. This, of course, applies to his detention in the School for Boys at Meriden, where he was detained by virtue of the judgment of the Juvenile Court, and from the custody of which school he was taken by the writ of *habeas corpus.* By virtue of an order of court pending the determination of the writ, he is now in the custody of the probation officer for the city of New Haven. By reason of the fact that when produced before the court in this latter proceeding he passed into its custody, its disposition of his temporary custody is legal, and not questioned in the case. We are concerned with his custody in the School for Boys, and the legality of that custody after bail had been refused.

The statute expressly provides that pending a hearing in the Juvenile Court and before commitment, a child may be admitted to bail. No similar provision exists for taking bail pending an appeal from the judgment of the Juvenile Court. The City Court of New Haven has the power and duty under General Statutes, § 6548, as amended in the Public Acts of 1921, Chap. 201, § 3, to take bail in criminal appeals within the period of forty-eight hours after conviction. No power is given a Juvenile Court to take bail on an appeal from its orders. By our common law any person in custody on appeal to the Court of Common Pleas, from his conviction of crime by an inferior court, may apply to the appellate court to be admitted to bail. The

Superior Court, on an appeal after conviction of crime, has the inherent power to admit to bail, but the power is discretionary, and its exercise not a matter of right accruing to the convicted defendant. *State* v. *Vaughan,* 71 Conn. 457, 461, 42 Atl. 640. Inferentially the Court of Common Pleas, a court proceeding according to the course of the common law, within its jurisdictional cognizance has the same power in criminal matters as we have just intimated. But clearly these various methods for release on bail do not affect an appeal like the one under consideration.

It is provided that the judge of the Juvenile Court, after a child has been brought before him by his issuance of summons, may make orders pending hearing for his custody or may admit him to bail. The Act is silent as to what shall take place in that regard, pending an appeal. We fail to see how any rule of law of general and governing application can supply the omission in this respect, and can only regard the defect of the Act in making provision for the contingency arising in this case as one which may not be helped out by any applicable and express provisions of law existing prior to the passage of the Act. The existing provisions for appeal to the criminal Court of Common Pleas are two: one General Statutes, § 6548, as amended by the Public Acts of 1921, Chapter 201, § 3, before referred to, and as to which we agree with the contention of counsel for plaintiff, that so far as it could by its terms affect appeals from the Juvenile Court, it has been rendered ineffective. There is another statutory provision, General Statutes, § 1870, not noticed in the argument of the case, which provides for appeals from commitments to schools and county homes. Among other things it provides that upon commitments to the Connecticut School for Boys, the appellant shall give a recognizance, with surety, to the State, con-

ditioned to answer the complaint and abide the order and judgment of the appellate court—the criminal Court of Common Pleas. It seems, however, that this provision specifically referring to the criminal Court of Common Pleas as the appellate tribunal cannot be enlarged by construction to cover an appeal to the civil Court of Common Pleas, a different tribunal, and one not at the time of the enactment of this section vested with appellate jurisdiction over matters of the kind with which the section is concerned.

We thus come to a situation where there is a detention in a place designated by statute by a commitment lawful, except as it may be vacated and superseded by the appeal. The boy was confined in the school, and there existed no statutory provision for his enlargement on bail by giving an appeal bond. Does the law contemplate his detention there until the determination of the appeal, or in default of any provision for bail should he be enlarged pending the determination?

In attacking the constitutionality of the Act as a whole, plaintiff's counsel invoked certain provisions of the Bill of Rights contained in Article I, § 9, which is wholly concerned with safeguarding the rights of persons charged with crime. Section 10 next following, however, provides that "no person shall be arrested, detained or punished, except in cases clearly warranted by law." The detention here contemplated is any detention not warranted by law, and need not arise out of any criminal prosecution.

As we have said before, there is no provision in the Juvenile Court Act for detention pending an appeal from that court, hence there was no warrant of law for such detention, and so by virtue of the section of the Constitution just quoted, the detention of the plaintiff by the defendant in the Connecticut School

for Boys was illegal, and he should be freed therefrom, and delivered to his father who is entitled to his custody.

The last question propounded in the reservation is answered "no," and we advise that the writ of *habeas corpus* should be sustained by the Court of Common Pleas.

The answers to the other questions propounded are sufficiently indicated in the foregoing opinion.

In this opinion the other judges concurred, except BURPEE, J., who dissented.